UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | : | |
|---|---|---|
| CRAIG SAKIN, | : | Civ. Action No.: |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| TOWER THREE PARTNERS LLC, | : | |
| and TOWER THREE PARTNERS | : | |
| FUND I GP LP, | : | |
| | : | |
| Defendants. | : | DECEMBER 31, 2012 |

**COMPLAINT WITH JURY DEMAND**

The plaintiff, Craig Sakin ("Mr. Sakin"), by and through his attorneys, Sandak Hennessey & Greco LLP, alleges for his complaint against Tower Three Partners LLC ("Tower Three"), and Tower Three Partners Fund I GP LP ("Tower Three GP"), as follows:

**NATURE OF ACTION**

1. In this action, Mr. Sakin seeks his contractually bargained-for compensation for his work in the successful buy-out and turn-around of the well-known retail chain Restoration Hardware, Inc. ("Restoration Hardware").

2. Mr. Sakin entered into a contractual relationship with Tower Three, a private equity firm. Among other things, the contract allocates to Mr. Sakin a share of the profits on any investment opportunities he sources. Mr. Sakin then brought to bear his experience, expertise, and contacts so as to source and develop the Restoration Hardware deal. Without Mr. Sakin's involvement and backing, Defendants never would have been able to participate in – and profit from – the buy-out and turn-around of Restoration Hardware.

3. On November 1, 2012, Defendants and Restoration Hardware's other private owners launched an initial public offering (the "IPO") that priced the revitalized company's shares at over five times what its owners had paid for it just four years earlier. Upon

1

information and belief, following the IPO, Defendants' investment in Restoration Hardware − an investment which was sourced solely by and would not have materialized but for Mr. Sakin's involvement – has brought them a profit of at least $100 million. Furthermore, upon information and belief, Defendants stand to earn hundreds of millions more through their retained equity stake in the restructured Restoration Hardware. Notwithstanding (i) the profitability of the Restoration Hardware deal, (ii) that Mr. Sakin orchestrated the deal, and (iii) the parties' contract which so clearly calls for Mr. Sakin to be paid specific percentages accordingly, Defendants, for reasons that remain unclear, simply refuse to recognize Mr. Sakin's right to receive compensation in connection with the Restoration Hardware transaction.

## PARTIES

4. Craig Sakin is a natural person and a resident of the State of Colorado.

5. Upon information and belief, Defendant Tower Three is a Delaware limited liability company, with its principal place of business in Greenwich, Connecticut. Tower Three is the investment manager of non-party Tower Three Partners Fund I LP ("Tower Fund I"), a private investment fund.

6. Upon information and belief, Defendant Tower Three GP is a Delaware limited partnership, with its principal place of business in Greenwich, Connecticut. Tower Three GP is the general partner of Tower Fund I. Upon information and belief, Tower Three GP is indirectly owned and controlled by Tower Three and William D. Forrest ("Forrest"), who is also the founder and a partner of Tower Three.

7. Upon information and belief, no member of Defendant Tower Three and no limited partner of Defendant Tower Three GP have citizenship in common with Mr. Sakin.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because Tower Three and Tower Three GP are headquartered in this district and are subject to the Court's personal jurisdiction, and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this district.

**FACTUAL ALLEGATIONS**

Background

10. Tower Three is a private equity fund focusing primarily on control or negative control investments in distressed middle-market businesses.

11. Tower Three was founded in 2007 by Forrest. Lacking a senior management team or any firm investment prospects, Forrest–who did not have experience as a principal in the private equity industry–set out to recruit a team of highly experienced executives capable of establishing and cultivating relationships with investors and identifying (or "sourcing") and leading investment opportunities of which Tower Three could take advantage.

12. Prior to forming Tower Three, in or about 2001, Forrest was associated with another private equity firm, Catterton Partners ("Catterton"), where he became acquainted with Mr. Sakin.

13. Mr. Sakin was an original partner at Catterton, and he helped build the firm into one of the largest and most successful consumer-focused middle market private equity firms in the United States. During his approximately thirteen years with Catterton, Mr. Sakin was a managing partner and a lead partner on numerous transactions, specifically on turnaround transactions, including but not limited to the acquisition and turn-around of

3

Odwalla, Inc., one of the nation's leading branded super premium beverage companies; Farley's & Sathers Candy Company, Inc., a leading player in the overall general line candy segment; and Gold Coast Beverage Distributors, one of the largest alcoholic beverage distribution companies.

14. Forrest worked at Catterton for approximately twelve months, during which time he failed to originate or complete any investment opportunities for the firm. Six years later, Forrest contacted Mr. Sakin for help and advice in the establishment of a new firm, Tower Three. Among other things, Forrest sought Mr. Sakin's help in recruiting a senior executive team for Tower Three and also asked Mr. Sakin to utilize his significant industry contacts in order to find investment opportunities for Tower Three's first investment fund, Tower Fund I.

15. Forrest promised Mr. Sakin that he would be compensated fairly for his work and that such compensation would include, among other things, a percentage of profits realized from transactions sourced by Sakin for Tower Fund I.

16. From late 2007 through June 2008, Mr. Sakin devoted substantial time and effort on behalf of Defendants so as to source and develop investment opportunities for Tower Fund I, as well as to identify and cultivate relationships with prospective investors for the fund.

17. Relying upon his extensive private equity experience, Mr. Sakin introduced Tower Three to a number of his business contacts. Among other things, Mr. Sakin also identified and led the due diligence and transaction process on prospective investments, put together investor presentations, negotiated with various lending institutions regarding the refinancing of existing facilities, met with management of prospective acquisition targets, and, most significantly, served as the liaison between Catterton and Tower Three with respect to the Restoration Hardware investment.

18.     Mr. Sakin also engaged in substantial recruiting activities at Forrest's behest, and it was Mr. Sakin's presence and involvement in Tower Three that enabled the firm to attract a qualified senior executive team.

19.     Mr. Sakin's involvement and association with Tower Three also lent the firm credibility with prospective investors.  Due to Forrest's lack of experience as a principal in the private equity industry, potential investors were hesitant to commit capital to Tower Fund I without assurances that a private equity veteran, with a proven investment track record, was backing Tower Three.  Thus, Mr. Sakin's involvement in, and association with, Tower Three was crucial to the firm's success and allowed the firm to raise hundreds of millions of dollars in capital.

20.     Most significantly, as relevant here, Mr. Sakin was solely responsible for sourcing Tower Fund I's first investment – the Restoration Hardware acquisition and turnaround.  Indeed, it was Mr. Sakin who convinced his fellow Catterton partners to invite Forrest and Tower Three to participate in the buy-out of Restoration Hardware that Catterton had designed.  Without this invitation, Tower Fund I, the investment vehicle controlled by Forrest and Tower Three, would not have been able to participate in the purchase, and subsequent turnaround, of Restoration Hardware.

21.     Mr. Sakin reassured Forrest, who lacked Mr. Sakin's investment experience, that the Restoration Hardware transaction was likely to be a successful investment, as it has proven to be.

22.     Mr. Sakin's efforts, including but not limited to those alleged above, were crucial to the success of Tower Three, Tower Three GP, and Tower Fund I.  Indeed, Mr. Sakin's involvement in the venture was considered so significant that his experience and qualifications were extensively touted in marketing materials and private placement memoranda distributed by Defendants to enlist investors in Tower Fund I.

The Restoration Hardware Transaction

23.	In June 2008, Tower Three and Tower Three GP, acting through Tower Fund I, joined Catterton and a small group of private investors in acquiring all of the outstanding shares of Restoration Hardware, a public company at that time.  Restoration Hardware's Board of Directors agreed to sell the company, on behalf of its shareholders, at a price of $4.50 per share.  At the time of the transaction, Restoration Hardware was in a "turnaround" situation, meaning that the company was not performing and may not have survived without a restructuring or other drastic change to the then-existing business model.  As a result of this "take-private" transaction, Tower Three and Catterton acquired a joint, controlling interest in Restoration Hardware, giving them equal representation on the company's board of directors and equal veto rights on all corporate decisions, as well as unilateral rights to replace the company's management.

24.	Under the joint stewardship of Catterton, Tower Three, and Restoration Hardware's other private owners, the downward trajectory of Restoration Hardware was reversed.  Among other things, the company's new management, with the assistance and backing of Mr. Sakin and other Catterton and Tower Three executives, identified and addressed operational inefficiencies, and developed and implemented programs aimed at reducing costs and increasing revenues (for example, the company closed 30% of its retail stores while substantially increasing catalog and on-line sales, which now account for nearly half of the company's revenue, and eliminated various operating inefficiencies).

25.	As one of Tower Three's directors appointed to the Board of Directors of Restoration Hardware, Mr. Sakin was instrumental in bringing about the change of fortune for the company.  As a result of these and other changes, Restoration Hardware has experienced ten consecutive quarters of double-digit revenue growth.

26.     On November 1, 2012, Catterton, Tower Three, and the other private owners of Restoration Hardware launched an IPO for approximately 5.2 million shares of Restoration Hardware stock, representing approximately 14% of the company's equity.  Priced at $24 per share, Restoration Hardware raised nearly $124 million through the IPO.  Following the IPO, Catterton and Tower Three each retain an approximate 30% stake in the company.

27.     As the general partner of Tower Fund I, Tower Three GP is entitled to receive a "carried interest" in the amount of 20% of the profits realized from Tower Fund I's investments.  With respect to Restoration Hardware, as of December 31, 2012, Tower Three GP's carried interest is worth, upon information and belief, no less than $70 million.

## FIRST CLAIM FOR RELIEF
### (Anticipatory Breach of Contract against Tower Three)

28.     Mr. Sakin repeats and realleges the allegations contained in paragraphs 1 through 27, as if fully set forth herein.

29.     Beginning in late 2007, Forrest and Mr. Sakin began negotiations to formalize the terms of Mr. Sakin's involvement in Tower Three, Tower Three GP, and Tower Fund I, including his responsibilities, capital contribution obligations, and compensation.

30.     On or about September 2, 2008, Tower Three and Mr. Sakin executed an agreement, effective as of August 12, 2008 (the "Original Term Sheet").  Among other things, the Original Term Sheet provided that:

   a.   Mr. Sakin would be a "Principal Member" of Tower Three with the title of "Partner," and a "Member" of non-party Tower Three Partners Fund I GP LLC (the general partner of Tower Three GP);

   b.   Mr. Sakin's responsibilities would be to source and execute investment transactions for Tower Fund I, to serve on the Investment Committee of Tower Three GP, and to assist in fundraising on behalf of Tower Three;

   c.   Mr. Sakin would receive quarterly fixed compensation of $62,500 payable quarterly in arrears, plus a bonus equal to between 20% and 40% of any net transaction fees;

7

  d. Mr. Sakin would own 5% of Tower Three, subject to certain vesting provisions;

  e. Mr. Sakin would receive "carried interest" points with respect to all transactions closed while Mr. Sakin remained a "Partner" of Tower Three as follows:

- 1.0 carried interest points[1] on all transactions;
- an additional 1.5 carried interest points on all transactions sourced and lead or co-lead by Mr. Sakin; and
- 2.5 carried interest points on the Restoration Hardware transaction;

  f. Mr. Sakin would be required to contribute capital as follows:

- $250,000.00 for each investment sourced, lead or co-lead by Mr. Sakin that was made by Tower Fund I, specifically including the Restoration Hardware transaction; and
- $100,000.00 for any other investment made by Tower Three for Tower Fund I.

31. On or about February 6, 2009, Tower Three and Mr. Sakin amended and superseded the Original Term Sheet by executing an agreement, which they made effective as of June 17, 2008 (the "<u>Amended Term Sheet</u>"), attached as Exhibit A to the present Complaint. The Amended Term Sheet is a valid and enforceable contract. Among other things, the Amended Term Sheet provides that:

  a. Mr. Sakin would be a "Principal Member" of Tower Three with the title of "Partner," and a "Member" of non-party Tower Three Partners Fund I GP LLC;

  b. Mr. Sakin's primary responsibilities would be to source and execute investment transactions for Tower Fund I, to serve on the Investment Committee of Tower Three GP, and to assist in fundraising on behalf of Tower Three, including making introductions to potential investors;

  c. Mr. Sakin would receive quarterly fixed compensation of $41,666.67 payable monthly in arrears, plus a bonus equal to between 20% and 40% of any net transaction fees;

  d. Mr. Sakin would have no ownership interest in Tower Three;

---

[1] In this context, a "carried interest point" refers to a 1% carried interest. Thus, in the case of Tower Fund I, where Tower Three GP was entitled to receive 20% of the profit realized on the fund's investments, Tower Three GP would receive 20.0 "points", and Mr. Sakin would receive 1.0 of those "points," equating to 1% of the profits from Tower Fund I's investments.

8

    e.    Mr. Sakin would receive a one-time bonus of $100,000.00 upon execution of the Amended Term Sheet;

    f.    Mr. Sakin would receive carried interest points with respect to all transactions closed while Mr. Sakin remained a "Partner" of Tower Three as follows:

- 2.0 carried interest points on all transactions;
- an additional 1.0 carried interest points on all transactions sourced and lead or co-lead by Mr. Sakin; and
- *2.5 carried interest points on the Restoration Hardware transaction;* (emphasis added)

    g.    the foregoing carried interest points granted to Mr. Sakin would vest incrementally over the second, third, and fourth anniversaries of the concerned investments, except that if Mr. Sakin's role as "Partner" in Tower Three was terminated either by Mr. Sakin or Tower Three for any reason within the first three years of Mr. Sakin's employment, Sakin would receive a *minimum of 2.0 carried interest points with respect to any transaction that had occurred as of the time of such a termination*; (emphasis added)

    h.    Mr. Sakin would be required to contribute capital as follows:

- $250,000.00 for each investment made by Tower Fund I that was sourced and lead or co-lead by Mr. Sakin, including the Restoration Hardware transaction; and
- $100,000.00 for any other investment made by Tower Three for Tower Fund I.

32.    Mr. Sakin fully performed and satisfied all of his obligations under the Amended Term Sheet (and the Original Term Sheet, for that matter). Among other things, Mr. Sakin sourced the Restoration Hardware transaction for Tower Fund I, structured and negotiated various portions of the transaction, led and performed due diligence for the deal, negotiated deal financing with various lending institutions, materially assisted in the preparation of investor presentation materials, and even served on the Board of Directors of Restoration Hardware.

33.    Furthermore, Mr. Sakin made over $350,000.00 in capital contributions to Tower Fund I. Because, upon information and belief, Restoration Hardware was Tower Fund I's sole investment during Mr. Sakin's tenure with Tower Three, Mr. Sakin's capital

contributions fully satisfied the capital commitment requirements under the Amended Term Sheet.

34. In any case, under the terms of the Amended Term Sheet, Mr. Sakin's right, upon termination from Tower Three within the first three years of his employment, to receive a minimum of two carried interest points with respect to the Restoration Hardware transaction is not contingent on Mr. Sakin's satisfaction of his capital commitments to Tower Fund I.

35. In or about July 2009, Forrest terminated Mr. Sakin's employment with Tower Three and his role as Partner.

36. Under the express terms of the Amended Term Sheet, Mr. Sakin is entitled to retain 2.0 carried interest points in connection with the Restoration Hardware transaction. As of December 31, 2012, upon information and belief, the approximate value of Mr. Sakin's contractually-guaranteed share of Tower Three GP's carried interest is no less than $7 million.

37. Despite Mr. Sakin's contractual right to retain 2.0 carried interest points in connection with the Restoration Hardware transaction, Tower Three has denied that Mr. Sakin is entitled to 2.0, or indeed to any, carried interest points, and has stated expressly that it will not convey Mr. Sakin's rightful interest to him. Thus, Tower Three has stated that it will not perform its obligations under the Amended Term Sheet, and that it will not honor Mr. Sakin's rights thereunder.

38. Tower Three's conduct amounts to an anticipatory repudiation of its obligations under the Amended Term Sheet to give Mr. Sakin a minimum of 2.0 carried interest points upon his termination from Tower Three.

39. As a result of Tower Three's conduct, Mr. Sakin has been injured.

## SECOND CLAIM FOR RELIEF
**(Declaratory Judgment: Entitlement to Carried Interest Points against Tower Three)**

40. Mr. Sakin repeats and realleges the allegations contained in paragraphs 1 through 39, as if fully set forth herein.

41. Tower Three denies that Mr. Sakin is owed any carried interest rights under the Amended Term Sheet.

42. Given Tower Three's refusal to recognize Mr. Sakin's carried interest rights under the contract, and its stated repudiation of Mr. Sakin's rights under that contract, Mr. Sakin reasonably expects that Tower Three will refuse to honor its promise to pay him the profits to which his two carried interest points entitle him.

43. There is no other proceeding that can provide Mr. Sakin with immediate redress.

44. Consequently, there is a real and justiciable controversy as to the rights and legal relations of the parties under the relevant contract.

45. Mr. Sakin seeks and is entitled to a declaration that he is contractually due 2.0 carried interest points in connection with the Restoration Hardware transaction.

## THIRD CLAIM FOR RELIEF
**(Alternative Claim for Unjust Enrichment against Tower Three)**

46. Mr. Sakin repeats and realleges the allegations contained in paragraphs 1 through 27, as if fully set forth herein.

47. Mr. Sakin used his extensive private equity contacts and experience on behalf of Tower Three to source the Restoration Hardware transaction as an investment for Tower Fund I.

48. The foregoing work performed by Mr. Sakin conferred a substantial benefit on Tower Three. Among other things, upon information and belief, as a result of Mr. Sakin's work in sourcing the investment in Restoration Hardware, Tower Three, in its capacity as

Tower Fund I's investment manager, has received approximately $25 million in management fees, which it would not have received but for Mr. Sakin's efforts. By way of example, just for the IPO of Restoration Hardware, Tower Three received $3.1 million in management fees.

49. Mr. Sakin has suffered a substantial detriment due to Tower Three's failure and refusal to compensate him for the efforts and work he performed on Tower Three's behalf.

50. Tower Three has been unjustly enriched by virtue of its failure and refusal to fairly compensate Mr. Sakin for his efforts and work on Tower Three's behalf.

51. If for whatever reason Mr. Sakin cannot recover under the Amended Term Sheet, then he lacks a contractual remedy.

52. Equity and good conscience require that Tower Three compensate Mr. Sakin for the substantial benefit that his labors bestowed on Tower Three.

53. Mr. Sakin seeks such compensation herein, in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
**(Alternative Claim for Unjust Enrichment against Tower Three GP)**

54. Mr. Sakin repeats and realleges the allegations contained in paragraphs 1 through 27, as if fully set forth herein.

55. Mr. Sakin's efforts in sourcing the Restoration Hardware transaction for Tower Fund I conferred a substantial benefit on Tower Three GP.

56. As general partner of Tower Fund I, Tower Three GP is entitled to 20% carried interest on the Restoration Hardware transaction. As of December 31, 2012, upon information and belief, this carried interest is worth approximately $70 million.

57. But for Mr. Sakin's efforts on its behalf, Tower Three GP would not have received the foregoing carried interest points.

58. To his detriment, Mr. Sakin has not been fairly compensated for his efforts and work on behalf of Tower Three GP.

59. Mr. Sakin lacks a remedy against Tower Three GP under any applicable contract.

60. As a result of Mr. Sakin's efforts and work on behalf of Tower Three GP without fair compensation, Tower Three GP has been unjustly enriched.

61. Equity and good conscience require that Tower Three GP disgorge the benefits they have received by way of unjust enrichment and due to Mr. Sakin's efforts, and which Tower Three has not earned.

62. Mr. Sakin seeks such disgorgement herein, in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF
**(Alternative Claim for Quantum Meruit
against Tower Three and Tower Three GP)**

63. Mr. Sakin repeats and realleges the allegations contained in paragraphs 1 through 27, as if fully set forth herein.

64. Mr. Sakin devoted substantial time and effort on behalf of Tower Three and Tower Three GP to identify investors, raise funds, and source investment opportunities for Tower Fund I.  Among other things, Mr. Sakin originated investment opportunities, performed and led due diligence for prospective investments of Tower Three, engaged in recruiting activities for Tower Three, identified and performed due diligence on prospective investments for Tower Fund I, solely sourced the Restoration Hardware deal for Defendants, served on the Board of Directors of Restoration Hardware, put together investor and lender presentations, identified potential lenders; negotiated with lending institutions the refinancing of existing facilities, met with management of prospective acquisition targets, and served as

the liaison between Catterton and Tower Three with respect to the Restoration Hardware investment.

65. Tower Three and Tower Three GP readily accepted Mr. Sakin's services and promised Mr. Sakin in return that he would be fairly compensated for his efforts, with such compensation to include, among other things, a percentage of the profits realized by Tower Three and Tower Three GP on the Restoration Hardware investment.

66. Mr. Sakin reasonably expected to receive fair compensation from Tower Three and Tower Three GP for his work and efforts on their behalf.

67. Tower Three and Tower Three GP have profited substantially from Mr. Sakin's work, efforts, experts, and contributions on their behalf.

68. To date, Tower Three and Tower Three GP have failed and refused to compensate Mr. Sakin fairly for his valuable hard work and services.

69. Equity and good conscience require that Tower Three and Tower Three GP compensate Mr. Sakin for the fair value of the work and services he performed on their behalf.

70. Mr. Sakin seeks such compensation herein, in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Sakin respectfully demands judgment as follows:

    a.    an award of damages, in an amount to be determined at trial, together with pre-judgment and post-judgment interest as permitted by law;

    b.    a declaratory judgment that Mr. Sakin is entitled to 2.0 carried interest points with respect to the Restoration Hardware transaction pursuant to his contract with Tower Three;

    c.    disgorgement of all sums and value received by Defendants by way of unjust enrichment;

    d.    compensation by way of *quantum meruit* for the valuable services provided by Mr. Sakin to Defendants;

    e.    an award of costs and fees incurred by Plaintiff in bringing this action;

    f.    such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Mr. Sakin demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

Dated:     December 31, 2012

**THE PLAINTIFF, CRAIG SAKIN**

By:   /s/ Liam S. Burke
      Liam S. Burke
      Federal Bar No.: ct27739
      Sandak Hennessey & Greco LLP
      707 Summer Street, 3rd Floor
      Stamford, CT 06901-1026
      (203) 425-4200
      (203) 325-8608 (fax)
      lburke@shglaw.com
      His attorneys.

      Michael Shuster
      (pro hac vice application to be filed)
      Daniel Goldberg
      (pro hac vice application to be filed)
      Delyan Dimitrov
      (pro hac vice application to be filed)
      Holwell Shuster & Goldberg LLP
      125 Broad Street, 39th Floor
      New York, NY 10004
      (646) 837-5151
      (646) 837-5150 (fax)
      His Attorneys.